UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


ALICIA M. PEDREIRA, et al.                                      PLAINTIFF


v.                                                          3:00-CV-210-CRS


SUNRISE CHILDREN'S SERVICES, INC., et al.                      DEFENDANTS



**MEMORANDUM OPINION**


This matter came before the court on motion of Sunrise Children's Services, Inc. f/k/a Kentucky Baptist Homes for Children, Inc. ("Sunrise") and Vicki Yates Brown Glisson, Secretary of the Cabinet for Health and Family Services, and John Tilley, Secretary of the Justice and Public Safety Cabinet (collectively, the "Commonwealth Defendants"), for reconsideration of the court's December 22, 2016 Memorandum Opinion and Order. DN 573. The court addressed the issues raised in the motion, save one, in a Memorandum Opinion and Order entered March 17, 2017. DN 579. The court ordered that "the motions of the defendants, Sunrise Children's Services, Inc., *et al*., for reconsideration of the court's December 22, 2016 Memorandum Opinion and Order (DNs 573, 577) are **GRANTED.** The court **DENIES IN ALL RESPECTS THE REQUEST TO VACATE THE DECEMBER 22, 2016 MEMORANDUM OPINION AND ORDER WITH THE EXCEPTION OF THE**

**QUESTION AS TO THE LEGALITY OF THE IMPLEMENTATION OF THE SETTLEMENT AGREEMENT, AS AMENDED, WITHOUT MODIFICATION OF EXISTING REGULTIONS. THIS EXCEPTED ISSUE IS HELD IN ABEYANCE PENDING FURTHER BRIEFING AS FOLLOWS…"** DN 579, pp. 11-12. The court then set a briefing schedule which has now concluded.

For purposes of completeness, the court will restate some pertinent background.

The action was remanded to this court by the United States Court of Appeals for the Sixth Circuit. The Court of Appeals returned the case for the explicit purpose of having this court decide whether the agreement reached between the plaintiffs and the Commonwealth Defendants to settle the case, an agreement which it found was a consent decree, was fair, reasonable and consistent with the public interest. The Court of Appeals added the further directive that the court consider its observation that "the consent decree denie[d] Sunrise a chance to clear its name," and "impose[d] the very reputational harm that Sunrise sought to avoid by means of 15 years of litigation." *Pedreira v. Sunrise Children's Services, Inc.*, 802 F.3d 865, 872 (6th Cir. 2015((*"Pedreira II"*).

Within a week after the denial of the plaintiffs' motion for rehearing en banc by the Sixth Circuit, the parties entered into a First Amendment to Settlement Agreement (hereinafter "the Amendment"). The parties attempted to address the Court of Appeals' concern that the Settlement Agreement "single[d] out Sunrise by name for special monitoring by the ACLU and Americans United." *Id.* Sunrise was the sole objector to the Settlement Agreement at that time.

In the Amendment's "Recitals," the parties stated, in part, that:

C. In light of this potential concern, the Parties desire to amend the Settlement Agreement to eliminate any "singl[ing] out" of or potential reputational harm to

Sunrise by uniformly applying the same monitoring triggers and rules to all Agencies, as set forth in this Amendment.

D.   Further, in light of objections raised by Sunrise during briefing concerning the Settlement Agreement, the Parties desire to clarify that no new or modified administrative regulations need to be enacted to comply with the Settlement Agreement.

In the Amendment's "Agreement" section, the parties agreed, in pertinent part, to:

Section 1. <u>Modification of Section 3.</u>

[Section 3 of the original agreement was deleted and replaced with new language which we do not recite here].

Section 2. <u>Approval of Settlement Agreement, as Amended; Dismissal of Lawsuit.</u>

[The parties agree to file a joint motion seeking the court's approval of the Amendment, dismissal of the action with prejudice, incorporation of the Amendment into the order of dismissal, retention by the court of jurisdiction to enforce the order, and to otherwise cooperate as necessary to obtain relief].

Section 3. <u>No regulatory changes needed.</u> Notwithstanding any references in the Settlement Agreement to possible enactment of new or modified administrative regulations, the Parties agree that the Commonwealth Defendants do not need to enact or modify any administrative regulations to comply with the Settlement Agreement.

[Section 6(b) remains in the text of the Settlement Agreement, as amended, which requires the Commonwealth to initiate the process of modifying any administrative regulations necessary for the Commonwealth to comply with the terms of the Settlement Agreement].

Section 4.   <u>No Effect Upon Other Terms of Settlement Agreement.</u>   Except as explicitly stated in this Amendment, all terms of the Settlement Agreement shall remain in full force and effect, and the Parties shall continue to comply with the Settlement Agreement, as amended herein, including during the pendency of any further proceedings in, or relating to dismissal of, the Lawsuit.

[Apparently, to date, the Commonwealth continues to comply with the terms of the original Settlement Agreement].

A change in administration in Kentucky upon the election of Governor Matthew G. Bevin yielded a change in approach to the settlement of this action. The Commonwealth Defendants no longer support the agreement forged with the plaintiffs. Faced with the refusal of the Commonwealth Defendants to join in a motion seeking approval of the amended agreement, the plaintiffs moved unilaterally for voluntary dismissal of the action with prejudice and approval of the Settlement Agreement, as amended, as a consent decree. DN 552. This motion, in and of itself was, we noted, a bit of an oxymoron, as it sought entry of a consent decree to which only the plaintiffs consent. Sunrise and the Commonwealth Defendants each filed objections to the plaintiffs' motion. In any event, the plaintiffs sought to hold the Commonwealth Defendants to the terms of the Settlement Agreement, as amended, and urged the court to reject the defendants' many arguments in opposition to approval.

In an opinion entered in December, the court determined that the Settlement Agreement, as amended, remains a viable proposed consent decree in the case. The court intended to address at a hearing, under the rubric of "fairness, reasonableness, and consistency with the public interest," a number of the defendants' arguments raised in opposition to the plaintiffs' motion for approval. However, concerned that the court had disregarded some of its arguments and dissatisfied with a number of the court's findings, Sunrise filed a motion to reconsider the December memorandum opinion and order. DN 573. Not unexpectedly, the plaintiffs opposed Sunrise's motion. DN 576.

Additionally, the Commonwealth Defendants filed their own response to Sunrise's motion, joining in support and adopting *in toto* the arguments made by Sunrise in its motion for reconsideration. DN 577.

Counsel for the Cabinets, Justin D. Clark, signed the pleading on behalf of the Commonwealth. He is counsel of record by virtue of his entry of appearance on behalf of both Cabinets. DN 562.[1] M. Steve Pitt and Chad Meredith, counsel from the Office of the Governor, are now also counsel of record for the Cabinets by virtue of the listing of their names as attorneys on this pleading, per Local Rule 83.5(d).[2]

The court noted that the Cabinets are now amply represented and purport to fully align themselves with the positions taken by Sunrise in this case. This alignment with Sunrise is diametrically opposed to the Commonwealth Defendants' previous position throughout the life of the Settlement Agreement and the Amendment.

The Court determined that Mona Womack had the authority to bind the Commonwealth Defendants to the Amendment and that the agreement in its original form is no longer operative, as it has been superseded by the Amendment. More specifically, by its terms, the Amendment preserves most of the original Settlement Agreement as written, altering and supplementing it in certain respects. Herein, we refer to the amalgamated document now in issue before the court as the "Settlement Agreement, as amended."

The court rejected the defendants' argument that the Settlement Agreement, as amended, is unenforceable for lack of consent. The court reasoned that the Commonwealth Defendants' entry into the Amendment *after* the Court of Appeals recited the reasons why the agreement was, in fact, a consent decree (even though the agreement itself declares otherwise) established that the Commonwealth Defendants thereby knowingly agreed to entry of a consent decree. Further support for this conclusion is the inclusion of Section 2 in the Amendment which listed the relief

---

[1] Mona Womack, Counsel for the Cabinets at the time the Settlement Agreement and Amendment were signed, has signed as counsel on the most recent pleading.

[2] The Governor of Kentucky is not a party to this action.

to be sought from the court. This list recited the factors which the Court of Appeals found were defining features of a consent decree – approval by the court, dismissal of the lawsuit with prejudice, incorporation of the settlement agreement into the order of dismissal, and retention by the court of jurisdiction to enforce the order.

This court determined that the Court of Appeals did not vacate the original Settlement Agreement. Rather, the Court of Appeals required this court to afford that agreement more intensive scrutiny on remand.

We concluded that consideration by this court of the Settlement Agreement, as amended, is not beyond the mandate of the Court of Appeals for reasons we do not restate here.[3]

The court did indicate, however, that

While we reject the suggestion that this is an "involuntary" proposed consent decree for the reasons stated in the December opinion, we do appreciate the fact that this court may not approve a consent decree which is illegal and, therefore, contrary to the public interest. *Vukovich*, 720 F.2d at 925. Courts have found that a mere change of heart by a party is an insufficient ground to reject a consent decree, but illegality is another matter. While a consent decree, as a matter of contract, may be binding upon the parties, it is not binding upon the court. The court being charged with finding fairness, reasonableness and consistency with the public interest before placing its judicial imprimatur on a consent decree, we must reject an agreement whose performance would be illegal. *Stovall v. City of Cocoa, Florida*, 117 F.3d 1238, 1242 (11th Cir. 1997); *Reynolds v. Roberts*, 251 F.3d 1350, 1358 (11th Cir. 2001); *Vukovich*, 720 F.2d at 925.

Sunrise's reply brief (DN 378), in which the Commonwealth joins, discusses in detail at pages 4-11 the grounds for its argument that the Settlement Agreement, as amended, illegally circumvents modifications to regulations which are required for implementation of the agreement.[4] As this additional detail was provided in

---

[3] The reasons for this conclusion can be found at DN 579, p. 5. The court also addressed and rejected in that memorandum opinion various additional allegations of errors in and omissions from the court's December 22, 2016, none of which are pertinent to the present analysis.

[4] The court found it was immaterial that changes had already been implemented, without regulatory amendment, under the original agreement, noting that the Settlement Agreement was a valid private settlement until the Court of Appeals ruled otherwise. As the original agreement was superseded by the Settlement Agreement, as amended, the court determined that it must consider this issue, as presently raised, in addressing the motion for approval of the agreement.

reply, the court has not been favored with a response by the plaintiffs. The Commonwealth defendants also weighed in on this issue after the plaintiffs' response. DN 577, pp. 2-4.

DN 579, p. 11. The court's concern about illegality prompted the request for another round of briefs, and we now address the issue.

The parties' positions are, not surprisingly, diametrically opposed. The plaintiffs urge that the terms of the settlement are encompassed by and fully consistent with existing provisions of Kentucky law, thus the Commonwealth Defendants need not engage in public comment and rulemaking in the event the Settlement Agreement, as amended, is implemented. Sunrise and the Commonwealth Defendants, on the other hand, contend that the settlement modifies or expands upon the language of, or rights guaranteed by, specific statutes or regulations, and Kentucky law mandates that authorizing statutes or regulations must be enacted under Kentucky's strict regulatory scheme. The plaintiffs note that the Commonwealth Defendants' position on the necessity for rulemaking constitutes a 180-degree shift from their position which aligned with the plaintiffs prior to the inauguration of Governor Bevin. We find this fact to be of no moment, as the matter stands before us. The Settlement Agreement, as amended, must be a legal agreement, or the court cannot approve its entry.

The parties do not dispute that in Kentucky "An administrative body shall not by internal policy, memorandum, or other form of action…[m]odify[,]…[e]xpand upon or limit a statute or administrative regulation…Any administrative body memorandum, internal policy, or other form of action violative of this section or the spirit thereof is null, void, and unenforceable." KRS 13A.130. Additionally, KRS 13A.100(1) provides:

> …any administrative body that is empowered to promulgate administrative regulations shall, by administrative regulation, prescribe, consistent with

applicable statutes…[e]ach statement of general applicability, policy, procedure, memorandum, or other form of action that implements; interprets; prescribes law or policy; describes the organization, procedure, or practice requirements of any administrative body, or affects private rights or procedures available to the public…

The parties agree that, should the provisions of the Settlement Agreement, as amended, modify, expand, or limit regulations governing child welfare, administrative procedures would be required to promulgate appropriate regulations. The parties' positions diverge only in the analysis whether such administrative rulemaking would be required if the Settlement Agreement, as amended, was approved and enforced.

The obligations with respect to the placement of children in child-caring facilities and foster homes set out in Section 2(a)(i) and (ii) of the Settlement Agreement begin with language which is both mandatory and pre-cursory: "Subject to the provisions of KRS § 199.801[5] and upon enactment of modified administrative regulations within KAR[6] Title 505[7] and KAR 922,[8]…the Commonwealth Defendants shall…" Thus, from the plain language of the agreement initially forged by the parties, they anticipated modification of administrative regulations as a precondition to the fulfillment of the obligations set out in Section 2.

When the agreement was originally brought before the court as a "Settlement Agreement," Sunrise questioned the validity of it in light of the precursory requirement to obtain modification of administrative regulations and the Commonwealth Defendants' failure to engage in such rulemaking. In approving the original agreement as a private settlement, the court found

---

[5] Addressing the establishment of procedures to determine and expedite the placement of children who are in the custody of the Department for Community Based Services.

[6] Kentucky Administrative Regulations.

[7] Title 505. Justice and Public Safety Cabinet – Department of Juvenile Justice.

[8] Ttitle 922. Cabinet for Health and Family Services – Department for Community Based Services – Protection and Permanency.

that Sunrise, an entity against which no claims remain[9] and a non-party to the settlement, had no

standing to challenge the terms agreed upon by the parties to the private settlement, and that was

the end of it. That was the end of it, of course, until the Sixth Circuit reversed this court's

judgment, finding that the agreement was not a private settlement agreement, but rather was a

consent decree, requiring greater scrutiny by this court before it could be approved.

After the Court of Appeals' decision, the plaintiffs attempted to take the issue of

modification of administrative regulations off the table by including a statement of agreement in

the Amendment:

> Section 3.    No regulatory changes needed.   Notwithstanding any references in
> the Settlement Agreement to possible enactment of new or modified
> administrative regulations, the Parties agree that the Commonwealth Defendants
> do not need to enact or modify any administrative regulations to comply with the
> Settlement Agreement.

Indeed, the plaintiffs actually acknowledge in their brief that Section 3 of the Amendment was

included in order to short-circuit the very analysis we undertake here:   "Additionally, in light of

Sunrise's prior arguments, the Amendment also 'clarif[ied] that no new or modified

administrative regulations need to be enacted to comply with the Settlement Agreement.'

[Amendment at p. 1]."   DN 580, p. 4.

The parties left the language regarding the enactment of modified administrative

regulations as originally written and instead chose to write around the clear language of the

original agreement by contracting between themselves that the term was unnecessary.   In stark

contrast to this approach, the parties readily struck Section 3 of the original agreement in its

_____

[9] The court noted that "[t]he Establishment Clause claim, the only remaining claim stated in the Second Amended
Complaint, was brought against the Commonwealth defendants…Despite the fact that the Establishment Clause
claim was premised upon certain factual allegations concerning Sunrise's actions while under contract with the

entirety and replaced it with new language recited in the Amendment in order to satisfy the Court of Appeal's fairness concern over the singling out of Sunrise.

If anything is clear from the Court of Appeal's decision it is that an agreement's inherent attributes, rather than any agreed interpretation by the parties, govern in the legal analysis. In holding that the original agreement was a consent decree rather than a settlement agreement, the Court of Appeals was unimpressed with the parties' inclusion in the terms of the original settlement their express *agreement* that the court was divested of contempt powers and a statement that it was *not* a consent decree. The court of appeals held

> Suffice it to say it takes more that this procedural two-step to circumvent this court's precedents regarding what counts as a consent decree and—more to the point—the requirements for entering one…And in any event our precedents, and not the parties' recitations (even as incorporated by the district court), determine whether the order is a consent decree.

*Pedreira v. Sunrise Children's Services, Inc.*, 802 F.3d 865, 871-72 (6th Cir. 2015).

The parties sought to settle the remaining "taxpayer claim" over Sunrise's objections by entering into a private settlement to which Sunrise could not object. It did not pass muster with the Court of Appeals. On remand, the parties again attempted to bypass the objections of Sunrise and to pass muster with the court by entering into an Amendment executed prior to the change in the Kentucky administration. However, we find that the parties' recitation in the Amendment that "no new or modified administrative regulations need to be enacted to comply with the Settlement Agreement" is but another "procedural two-step" which is wholly ineffectual to nullify the mandate for regulatory action contained in the terms of the original agreement and remaining in the Settlement Agreement, as amended.

---

Commonwealth, relief for the purported Establishment Clause violation was sought as against the Commonwealth defendants only. No such claim could be maintained against Sunrise." DN 527, p. 6.

The plaintiffs consistently focus on the fact that the Commonwealth Defendants have, since Governor Bevin took office, declined to seek enforcement of the agreement, and, in fact, now join with Sunrise in objecting to its entry. The plaintiffs roundly criticize this reversal of direction by the Commonwealth Defendants as politically motivated, and steadfastly cling to the Settlement Agreement, as amended, despite the fact that they alone now support it. The question of politics--either the politics of the administration that now objects to entry of the consent decree, or of the administration with which the plaintiffs forged the agreement--matters not a whit in this analysis. The court is concerned only with the legality of the agreement, whether it is reasonable, fair to those affected, and whether the public interest is served by its entry. We have found that the parties' agreement that promulgation of amended regulations is unnecessary does nothing to take the issue off the table. Instead, we now look to the substance of the agreement to determine whether the various provisions modify, expand upon, or limit regulations currently in force.

922 KAR 1:300, Section 6(7) provides that

(a) Facility policy shall demonstrate consideration for and sensitivity to: (1) The racial, cultural, ethnic, and religious background of a child in care; and (2) Availability of activities appropriate to the child's cultural or ethnic origin.

(b) With the exception of a religious practice that is destructive or places a child in physical danger, an opportunity shall be provided for a child to: (1) Practice the religious belief and faith of the child's individual or family preference; and (2) Participate in a religious activity without coercion.

The plaintiffs urge, essentially, that these provisions coupled with other regulations establishing standards for child-caring and child-placing facilities and foster homes under contract with the Cabinet, and those regulating the intake, placement, and discharge of children committed to the care of the Commonwealth, are broad enough to encompass all of the actions required to be taken

by the provisions of the Settlement Agreement, as amended, without the need for any modification or enactment of new regulations. Sunrise and the Commonwealth defendants disagree, arguing that the agreement's provisions require action which impermissibly modifies, expands, or limits the policies and procedures set forth in the presently enacted regulations.

> An administrative agency, as a purely statutory creation, possesses no inherent authority and derives all of its rule-making authority from legislative grant. *Brown v. Jefferson County Police Merit Bd.,* 751 S.W.2d 23, 25 (Ky.1988)…Where reasonable doubt exists concerning the proper scope of an administrative agency's power, the question must be resolved against the agency to limit its power. *Board of Education of City of Newport v. Scott,* 189 Ky. 225, 227, 224 S.W. 680, 681 (1920).

*Fisher v. Com., Pub. Prot. Cabinet, Dep't of Hous., Bldgs. & Const., Div. of Plumbing*, 403 S.W.3d 69, 78 (Ky. Ct. App. 2013).

Where there is a question concerning the scope or extent of an agency's power, the court must err on the side of limiting that agency's power. There must be some modicum of discretion afforded the Commonwealth Defendants in managing their daily affairs, but such discretion must be authorized and must remain within the scope of the governing regulations. In our evaluation of the agreement's provisions, where there is a superimposition of terms which require the Commonwealth, or parties under contract with the Commonwealth, to take action not clearly encompassed within and permitted by the existing regulations, those provisions must be found to exceed the agencies' powers.

Sections 2(a)(i) and 2(a)(ii) require that

> [P]rior to placing any child [at a child-caring facility or at a foster home], the Commonwealth Defendants shall…inform [or in the case of a foster home placement, shall require the child-placing agency to inform] the child, and the child's parent(s) or guardian…about the [child-caring facility's or foster home's] religious affiliation, if any[,]…inquire whether the child or parent or guardian objects[,]…consider such objection and make reasonable efforts to provide an alternative placement if an alternative placement exists…If the Commonwealth

Defendants [or child-placing agency] place a child at a [child-caring facility or foster home] over the child's or parent's or guardian's objection with respect to the religious affiliation[,]…the Commonwealth Defendants [or child-placing agency] shall promptly document in writing the reasons why such placement was made over the objection of the child or the child's parent or guardian concerning the [child-caring facility's or foster home's] religious affiliation, and why no alternative placement was made to accommodate the child's or parent's or guardian's objection…

The plaintiffs urge that these provisions do nothing more than specify in further detail how the Commonwealth Defendants must accomplish already existing requirements. These provisions, however, limit the discretion of the Commonwealth Defendants and child-placing agencies in determining appropriate placement of children. Existing regulations require sensitivity to the religious background of a child, protection from religious discrimination, and provision of an opportunity for the practice of the child's or family's religion of choice. Under the present regulations, in determining the appropriate placement of a child, the CHFS staff obtains information concerning the child's history and needs, which includes a child's religious background and practices as reflected on intake form DPP-886. 922 KAR § 1:360(2)(2)(k). During the intake process by the child-caring facility, the facility collects information on the child, including a social history which includes information on religion. 922 KAR § 1:300(7)(f)(4). In creating the child's treatment plan after intake, the treatment team will obtain a social assessment which includes information on the child's religion. 922 KAR § 1:300(7)(3)(a)(5).

The plaintiffs contend that the agreement's §§ 2(a)(i) and 2(a)(ii) merely ensure that the Commonwealth Defendants are doing what they should be doing anyway. The court thinks not. The provisions convert discretion into dialogue with children and parents and guardians concerning appropriate placement, and afford the child, parent or guardian near veto power on

placement by objecting to the entity's religious affiliation. Not only does the child, parent, or guardian have a level of input which did not heretofore exist, but the Commonwealth Defendants and child-placing agencies are constrained to accept the objection and afford alternative placement, or justify, in writing, placement in a child-caring facility or foster home over that objection.

The sentence at the end of these provisions states "Nothing in this subsection shall be construed to interfere with the Commonwealth Defendants' [or child-placing agency's] ability to exercise their reasonable and good faith discretion regarding the placement that it is in the best interests of the child." This does not save the provisions from limiting the discretion of the Commonwealth Defendants and child-placing agencies, or at the very least, modifying the calculus by which appropriate placement of a child is determined. Regardless of the disclaiming language, the provisions do more than monitor a child-caring facility's or foster home's sensitivity to the religious background of a child, but rather mandate that the Commonwealth Defendants [or child-placing agency] engage in a pre-placement vetting process with the child and parent or guardian. We do not weigh in on whether there are benefits to be gained by affording the child, parent or guardian near veto power and limiting the discretion of the Commonwealth Defendants or child-placing agency in placing a child, as that is not the measure we are to take of these provisions. Rather, we conclude only that, despite the stated intention not to do so, the provisions limit discretion in appropriate child placement decisions and modify the process by requiring a dialogue concerning religious affiliation with the child, parent, or guardian and affording a corresponding right of objection.

Sections 2(b)(i) and 2(b)(ii) require that, prior to placing a child at a child-caring facility, or with a child-placing agency for placement in a foster home,

(i)     …the Commonwealth Defendants shall…inform the child, and the child's parent(s) or guardian…of the terms of the modified PCC Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e), and 2(f) of this Agreement[,]…inform the child and the child's parent(s) or guardian…of the contact information for the available Ombudsman for the Cabinet for Health and Family Services ("Ombudsman") and the Service Appeal Process set forth in 922 KAR 1:320 ("Service Appeal Process"), and that the Ombudsman and the Service Appeal Process are available in the event the child or parent or guardian has concerns regarding the [child-caring facility's or child-placing agency's] alleged violations of the terms of the modified PCC[10] Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e) and 2(f); provide the child with a document, that the child could keep on his or her person or in his or her room, containing information about the terms of the modified PCC Agreement and procedures set forth in Section (a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process.

(ii)    The PCC Agreement shall be modified to provide that a child-caring facility shall post information, in at least one common area of the child-caring facility, about the terms of the modified PCC Agreement and procedures set forth in Sections 2(a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process; and that a child-placing agency shall post information, in a prominent place in each location operated by the child-placing agency, about the terms of the modified PCC Agreement and procedures set forth in Section 2(a), 2(d)(i)-(ii), 2(e), and 2(f), the Ombudsman, and the Service Appeal Process.

The plaintiffs argue that these provisions are encompassed by 922 KAR §§ 1:300(7)(1)(h) and 1:300(7)(1)(i). However, 1:300(7)(1)(h) requires that, before the child's admission, the *child-caring facility* inform the child and custodian, in writing, of the child's rights and the child-caring facility's responsibilities, including policy pertaining to services offered to the child. Section 1:300(7)(i) requires that the child be informed upon admission *by the child-caring facility* of the right to file a grievance.

On its face, the provisions of the Settlement Agreement, as amended, modify the existing procedure by requiring that the *Commonwealth Defendants* provide the child and parent or

---

[10] Private Child Care agreement, the contract between the Commonwealth Defendants and private child-caring facilities and child-placing agencies.

guardian particular information relating to religious rights *pre-placement*. Further, the provisions require that the Commonwealth Defendants inform the child and parent or guardian of the terms of their contract with the child-caring facilities and child-placing agencies, and of certain terms of the Settlement Agreement, as amended. The plaintiffs have identified nothing in the statutes or regulations which contemplate that terms of internal operating documents of the Commonwealth agencies or the provisions of settlement documents in a lawsuit be provided to children or their parents or guardians for any purpose.

It is clear that children and their parents or guardians are to be informed of children's rights, including their rights to religious freedoms, while in care, and to know of the procedures in place for the filing of a grievance for violation of those rights. Under the current regulations, it is the responsibility of the child-caring facility to communicate in writing the rights of the child while in care and the responsibilities of the child-caring facility to the child and parent or guardian before admission. Subparagraph (ii) requires that writing to be in the form of a poster to be prominently placed in child-caring facilities and child-placing agencies.

The plaintiffs have attached as an exhibit to their supplemental brief a poster which the parties agreed complied with the posting requirement of 2(b)(ii) for child-caring facilities to post information about the terms of the modified PCC Agreement and procedures set forth in the Settlement Agreement, as amended. The poster identifies with specificity the child's religious rights while in care and the responsibilities of the child-caring facility with respect to those rights, and information on the right and the process to file a grievance. This poster provides information about rights, responsibilities, and protections which the amended PCC and the Settlement Agreement, as amended, address. The child-caring facility is required to provide rights and redress information in writing to the child. There is therefore nothing objectionable

about the poster per se.   Again, our task is not to render a value judgment concerning the posting requirement of 2(b)(ii), but rather to determine whether it is within the discretion granted to the Commonwealth Defendants by existing regulations to require the prominent display of such posters.

To the extent that subparagraph (2)(b)(i) mandates the communication of certain content, and alters when it is communicated and by whom it is communicated, the provision limits the discretion of the Commonwealth Defendants in the method and means by which they monitor the facilities which contract under the modified PCCs, and it imposes additional obligations on the Commonwealth Defendants in the placement process.   At the very least, the provision modifies the existing regulatory procedure by imposing on the Commonwealth Defendants the obligation to provide the terms of facility contracts and settlement obligations, in order to highlight for the child and parent or guardian, pre-placement, the means by which the child's religious freedoms are to be protected.

Sections 2(h) and 2(i) also raise some concern.   These sections provide:

(h)     Agency Exit Surveys. The Commonwealth Defendants shall prepare a brief exit survey concerning the child's experiences and impressions regarding the child-caring facility's religious activities and accommodations. During the week of a planned discharge for any child who has been in the care of a single child-caring facility for one month or longer, the Agency shall (i) provide the child with the exit survey, (ii) provide a secure location for the child to submit the exit survey anonymously, and (iii) submit the exit surveys to the Commonwealth Defendants on at least a quarterly basis. The Commonwealth Defendants shall maintain these exit surveys, organized by the Agency from which the surveys were received. Such exit survey shall include, but not be limited to, questions concerning whether the child experienced any alleged form of religious coercion, discrimination, or proselytization during such placement, as described in Section 2(f). The central office of the Department for Community Based Services or Department of Juvenile Justice, or their counsel, shall investigate any allegations of religious coercion, discrimination, or proselytization contained within the Exit

Surveys, and take appropriate action, as necessary. The Commonwealth Defendants, in their reasonable and good faith discretion, shall determine whether any such allegation of religious coercion, proselytization, or discrimination may violate the terms of Sections 2(d), (e) or (f) of this Agreement and thus merits a referral of the complaint to the Office of Inspector General within the Cabinet for Health and Family Services ("Office of Inspector General") for further investigation and other appropriate action, as deemed necessary by the Office of Inspector General in its reasonable and good faith discretion.

(i)     Case Manager Surveys. The Commonwealth Defendants shall require case workers to (i) question all children on their caseload about the child's experiences and impressions regarding the Agency's religious activities and accommodation at one of the "home visits" made by the case worker annually, and (ii) document the children's responses in TWIST, or through other similar documentation. The questions shall include without limitation inquiries regarding the activities prohibited by Section 2(f). If a case worker believes that an Agency has engaged in an act of religious coercion, discrimination, or proselytization, the case worker shall report such complaint and suspected behavior to the central office of the Department for Community Based Services or Department of Juvenile Justice, who shall investigate any such allegations, and take appropriate action, as necessary. The Commonwealth Defendants, in their reasonable and good faith discretion, shall determine whether any such allegation of religious coercion, discrimination, or proselytization may violate the terms of Sections 2(d), (e) or (f) of this Agreement and thus merits a referral of the complaint to the Office of Inspector General for further investigation and other appropriate action, as deemed necessary by the Office of Inspector General in its reasonable and good faith discretion.

The plaintiffs contend that the provision which requires the creation of and particularized implementation of an exit survey addressed to the religious activities and accommodations provided by the child-caring facilities during the child's term of care is wholly consistent with the common practice of interviewing children upon discharge. They do not cite a regulatory provision which governs the procedure. However, we note that 922 KAR § 1:300(7)(6) discussing discharge and aftercare appears to be focused on ensuring a successful transition for the child, requiring, for example, a discharge summary which discusses the goals of treatment,

and progress toward completion, barriers to treatment, methods, date of discharge, reason for discharge and services needed. The discharge process includes a planning component and coordination of care for the child. 1:300(7)(6).

The exit survey mandated by the Settlement Agreement, as amended, differs in kind and purpose from anything which is apparent in the discharge and aftercare provisions. While common practice in the discharge process is to conduct exit interviews, the requirements of (2)(h) are more in the nature of a "debriefing," addressed to compliance by the child-caring facility with the provisions of the Settlement Agreement, as amended, rather than gathering discharge planning information for the child. The investigation-triggering mechanism of the provision also expands upon the current regulations and imposes procedures which are not clearly encompassed within the current regulations. While in a broad sense, the obligations of the child-caring facility to be sensitive to the religious beliefs of the child and to avoid coercive practices may be served by the monitoring and investigation of the facilities through such an exit survey, the imposition of such a regime expands upon and modifies the regulations governing discharge and aftercare of children.

We are less concerned with the provision concerning case manager surveys, as questions concerning religious accommodation and activities more easily fall within the scope of existing regulations which provide for annual home visits by Commonwealth case workers and a "utilization review" which must be performed for a child six months from the initial placement or reassignment, and every three months thereafter. As we found with section 2(h), we question whether the investigation-triggering mechanism and procedures set out in 2(i) come within any existing regulation.

Finally, 2(e)(i) and (ii) prohibit child-caring facilities and foster homes from providing religious articles, symbols, texts, and materials unless the child requests them. Specifically, no religious symbols or other religious articles may be placed in a child's private room, and the facility or home may not "automatically" provide religious texts or material to any child, unless requested by the child. In defending this provision as within the scope of the regulations, the plaintiffs state that "Forcibly providing religious materials to a child, without the child's request or consent constitutes impermissible 'coercion,' and does not 'demonstrate consideration for and sensitivity to' the child's 'religious background.'" DN 580, p. 12. The plaintiffs' statement is clearly true – "forcibly" providing materials would be coercive. However, the prohibition is not limited to circumstances in which a child would be required to accept articles or materials or to participate in religious practices or activities against the child's will or without the child's consent. Rather, the provision prevents the display or offering of any symbol or material; that is, it prevents exposure to religious materials altogether unless solely initiated by the child. This provision appears to the court to arguably reach beyond the goals of "sensitivity" and "avoidance of coercion." However, we do not pass judgment on this point as we find that it would be within the power of the Commonwealth Defendants to prohibit PCC-contracting parties from presenting or offering such materials, should the Commonwealth Defendants deem such actions, in their discretion, to be coercive and/or insensitive to a child's religious background. To that end, we do not find the provisions to be beyond the power of the Commonwealth Defendants and we need go no further in evaluating provisions 2(e)(i) and (ii).

In sum, we reiterate that the Settlement Agreement, as originally written, required the Commonwealth Defendants to make various modifications to their PCC Agreements and procedures "upon enactment of modified administrative regulations within KAR Title 505 and

KAR Title 922." DN 552-1, pp. 2-3. Upon remand of the case from the Sixth Circuit, prior to moving this court for review of the Settlement Agreement again, the plaintiffs and Commonwealth Defendants entered into the "First Amendment to Settlement Agreement." DN 552-2. The amendment did not alter or remove the language requiring the enactment of administrative regulations, despite the fact that it struck and rewrote another section of the Settlement Agreement, Section 3, in order to overcome Sunrise's objections and the Sixth Circuit's concerns about that provision. Rather, the amendment stated that "in light of objections raised by Sunrise during briefing concerning the Settlement Agreement, the Parties desire to clarify that no new or modified administrative regulations need to be enacted to comply with the Settlement Agreement." DN 552-2, p. 1.

The melding of the two documents--the original Settlement Agreement and the First Amendment to Settlement Agreement – yields a document which, by its terms, requires the enactment of modified administrative regulations but which excuses performance of that term as "unnecessary."

We find that some of the actions required to be taken by the Commonwealth Defendants do not fall within the existing statutory provisions and would therefore require rulemaking to modify existing regulations or to enact new provisions to allow for legal implementation of the Settlement Agreement, as amended.

The plaintiffs and Commonwealth Defendants' attempted emasculation of the clear language requiring rulemaking by agreeing in the Amendment, prior to consideration by the court or any further comment by Sunrise, that rulemaking was unnecessary renders the Settlement Agreement, as amended, untenable. The document requires rulemaking, but then evidences that

the parties have agreed not to comply with the requirement. Thus the predilection, both pre- and post-Bevin-election, was to decline to seek modification of the administrative regulations.

As Kentucky law establishes that actions by administrative bodies cannot independently modify, expand upon, or limit statutes or administrative regulations through an agreement such as the proposed consent decree (KRS 13A.130), this court must reject the consent decree, as its performance would be illegal. *Stovall*, 117 F.3d at 1242; *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013)(a district court abuses its discretion when it enters a consent decree that substantially amends an agency rule otherwise subject to rulemaking).

We find no comfort in the plaintiffs' statement that the Settlement Agreement, as amended, does not preclude the Commonwealth Defendants from engaging in rulemaking. The plaintiffs stand alone in seeking approval of the proposed consent decree. The Defendants never had the intention to engage in rulemaking under the agreement. The Commonwealth Defendants' staunch position in this case would certainly suggest a future refusal on the horizon to engage in rulemaking in order to implement its provisions, absent a court order to do so. Under such circumstances, the court would be asked to order the Commonwealth Defendants to engage in rulemaking that they did not intend to engage in at the time the agreement was formed. It seems, all around, that the entry of the proposed consent decree would be improper and a clear abuse of discretion by this court.

The court will deny the motion of the plaintiffs for voluntary dismissal of the action with prejudice and approval of the Settlement Agreement, as amended, as a consent decree (DN 552) by separate order. No fairness hearing is necessary, as the court has determined that the legality issue and the weighing of the public interest control the outcome herein.

A separate order will be entered herein this date in accordance with this opinion.

**IT IS SO ORDERED.**

May 29, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**