UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CASE NO. 3:00-cv-210-S

| | |
|---|---|
| ALICIA PEDREIRA, ET AL., ) | |
| ) | |
| PLAINTIFFS, ) | **SUNRISE CHILDREN'S SERVICES'** |
| ) | **REPLY IN SUPPORT OF ITS MOTION** |
| ) | **FOR SUMMARY JUDGMENT** |
| v. ) | |
| ) | |
| SUNRISE CHILDREN'S SERVICES ) | |
| INC., ET AL., ) | |
| ) | |
| DEFENDANTS. ) | |

\*\*\*\*\*   \*\*\*\*\*   \*\*\*\*\*

Defendant Sunrise Children's Services, Inc. ("Sunrise"), by counsel, for its reply in support of its motion for summary judgment (DN 480) states as follows:

## INTRODUCTION

Tellingly, the majority of Plaintiffs' response focuses on arguments that this Court has already supposedly ruled against Sunrise's and Kentucky's summary-judgment motions (it has not) or that more discovery is necessary in this twenty-year-old case before the Court rules on summary judgment (it is not). But, none of the Court's prior Rule 12 or pre-discovery orders forecloses consideration of the post-discovery, summary-judgment motion now pending before the Court. Rather, the orders cited by Plaintiffs welcomed additional dispositive motions once the record in the case was further developed.

Nor does Plaintiffs' claim, at the last possible second, that more discovery is necessary present good cause for the Court to avoid ruling on the summary-judgment motion. Sunrise's and Kentucky's summary-judgment motions are ripe for decision. Plaintiffs' *modus operandi*

throughout this case has been to do everything they can to delay and avoid adjudication of the merits. Plaintiffs' claim that more discovery is necessary is more of the same.

Further, the scant arguments Plaintiffs make regarding the merits should not dissuade the Court from granting summary judgment. Plaintiffs myopically focus on Sunrise's allegedly pervasively sectarian nature and purported proselytization of its residents. But, notwithstanding the inapposite and outdated cases cited by Plaintiffs, it has not been the law for a long time, if it ever was, that an Establishment Clause violation can be predicated on the mere basis of a government funding recipient's sectarian nature. Nor are vague allegations of proselytization that supposedly occurred at *Sunrise's* facilities a sufficient basis to create a genuine issue of material fact on a claim that *Kentucky's* Private Child Care contract for services system ("PCC System") violates the Establishment Clause—especially since it is uncontradicted that the PCC System is neutrally applied between religiously-affiliated and non-religious agencies and Kentucky has established numerous safeguards to ensure government funds are used only for secular purposes. It is past time for this litigation to come to an end. Sunrise's and Kentucky's motions for summary judgment should be granted.

## ARGUMENT

**A.     The Court has <u>not</u> already decided against Sunrise's summary-judgment motion.**

Plaintiffs assert that a July 23, 2001 opinion of the Court (DN 53) somehow categorically foreclosed Sunrise's possibility of success on its summary-judgment motion. Not so. A glance at the docket confirms that the summary-judgment motion is still pending before the Court. The briefing schedule set by the Court on the motion is not some mere hollow exercise as Plaintiffs allege. (DN 596).

The Court's July 23, 2001 opinion addressed a Rule 12 motion (DN 17) and a pre-discovery summary-judgment motion (DN 24). The opinion is indicative only of the Court's conclusion that Plaintiffs had done the bare minimum to keep their claim afloat during the early, pre-discovery phase of the case by alleging a claim for relief. Further, the opinion is interlocutory and subject to being revisited by the Court at any time. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) (every order short of final decree subject to revisitation at discretion of court); *Marconi Wireless Telegraph Co. v. United States*, 320 U.S. 1 (1943) (court has inherent power to revisit interlocutory orders before final judgment). Thus, the opinion has no preclusive effect. *See Rayfield v. Am. Reliable Ins. Co.*, 641 F.App'x 533, 537 (6th Cir. 2016) ("[A]n interlocutory order denying summary judgment 'does not have res judicata effect.' ") (quoting *Elder v. Twp. of Harrison*, 489 F.App'x 934, 936 (6th Cir. 2012)).

Indeed, the Court's order acknowledges it is interlocutory in effect and invites Sunrise to file another summary-judgment motion as the evidentiary record develops, stating "Since there is little in the way of evidence upon which to further address the Establishment Clause claim, the motion for summary judgment will be denied at this time, <u>with leave to revisit the issue when the record is more fully developed</u>." (DN 53 at 13) (emphasis added).

Plaintiffs similarly misconstrue the Court's opinions of April 16, 2003 (DN 110) and November 3, 2003 (DN 131). These opinions concluded only that Plaintiffs had satisfied the threshold, jurisdictional requirement of possessing standing to assert their Establishment Clause claim. The opinions expressly state that the Court was withholding judgment on the sufficiency of the parties' proof, which has now been thoroughly developed through the intervening years of discovery and is ready to be addressed in the instant summary-judgment motion. (DN 131) ("The ultimate sufficiency of the proof is not at issue here."). The Court's pre-discovery rulings have no

bearing on the present motion, which is supported by a full evidentiary record and was filed at the invitation of the Court. The Court should reject Plaintiffs' latest effort to avoid consideration of this dispute on the merits.[1]

**B.     Plaintiffs' claim that more discovery is necessary fails to justify further delay.**

*1.     Plaintiffs failed to support their request for more discovery with an affidavit.*

Federal Rule of Civil Procedure 56(d) sets forth a specific and mandatory procedure for seeking additional discovery to respond to a summary-judgment motion, requiring detailed allegations showing a non-movant "cannot present facts essential to justify its opposition." This showing must be made before the response deadline. *See, e.g.*, *Chapple v. Wickerlink*, 2012 U.S. Dist. LEXIS 139656, at *2-4 (W.D. Mich. Sept. 28, 2012). Here, Plaintiffs waited until the last conceivable moment—late in the evening of the due date for their summary-judgment response—to assert their purported need for additional time to complete discovery. But, Plaintiffs failed to abide by Rule 56(d)'s requirement that requests for additional discovery must be supported by affidavit. Their request is too little, too late.

Rule 56(d) states:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

The Rule plainly requires that a party seeking additional discovery before responding to summary judgment must make this showing by filing an affidavit. *See, e.g.*, *Heartland Props., LLC v. La Quinta Corp.*, 2007 U.S. Dist. LEXIS 107309, at *6 (W.D. Ky. Mar. 19. 2007) (Simpson, J.).

---

[1] Further, Plaintiffs' assertion that the Court already conclusively decided against summary judgment in 2003 inherently contradicts their argument that Sunrise's summary-judgment motion was filed prematurely. (DN 620, Resp. ¶ 7). If it is premature to decide a summary-judgment motion filed in 2012, why was it not premature to rule conclusively against summary judgment in 2003? Of course, the suggestion that it is premature in 2020 to decide a summary-judgment motion filed in 2012 in a case filed in 2000 is laughable.

"The importance of complying with Rule 56(f)[2] cannot be overemphasized." *Id.* at *7 (quoting *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000)). Indeed, a reference to Rule 56(d) and the need for additional discovery "in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Cacevic*, 226 F.3d at 488 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *Heartland Props.*, 2007 U.S. Dist. LEXIS 107309, at *7 (failure to comply with Rule 56(f) is "fatal" to motion to extend discovery prior to summary-judgment response). Plaintiffs' request that discovery be reopened should be denied on the basis of their failure to comply with Rule 56(d) standing alone.

### 2. *Rule 56(d) failures aside, Plaintiffs fail to justify reopening discovery.*

As noted, Plaintiffs' failure to comply with Rule 56(d) forfeited their opportunity to engage in additional discovery. However, even if the Court were to consider Plaintiffs' deficient arguments, none of them provides an adequate justification for reopening discovery.

To begin with, Plaintiffs' assertion that Sunrise filed its summary-judgment motion "in the middle of the discovery process" is incorrect. (DN 620, Resp. ¶ 3). The discovery cut-off in this case expired on July 31, 2008—over four years before Sunrise filed its motion. (*See* DN 302). Thus, the only possible continuation of discovery beyond that point was limited to a few discrete topics briefed to the Court—discovery pertaining to certain former employees and residents of Sunrise. (*See* DN 382, DN 469).

Further, Plaintiffs' claim that Sunrise "battled" and prevented Plaintiffs from discovery of this supposedly "critical information" is belied by the record. (DN 620, Resp. ¶ 3). It was Plaintiffs,

---

[2] Some of the cases cited in this Section were decided before non-material changes were made to the language of Rule 56(f) and the relevant provision was moved to Rule 56(d).

5

not Sunrise, who filed a motion to stay the proceedings just as they were supposedly "on the cusp of finally being permitted to obtain critical information." (DN 497). Further, it was Plaintiffs who specifically included language in their motion to stay that prohibited further discovery, including collecting any discovery from Sunrise, while settlement negotiations with the Commonwealth were ongoing. (DN 497 ¶ 5). Sunrise did not join in that motion.

Even more, after the March 22, 2013 stay sought by Plaintiffs and entered by Judge Moyer expired on its own terms, Plaintiffs failed to make any effort to pursue the supposedly "critical" discovery. (DN 501). Judge Moyer's order only stayed the case until Plaintiffs "file[d] an Agreed Order dismissing this case with prejudice pursuant to the Settlement Agreement." (DN 501 at 1). After the Court's order allowing dismissal of the case was overturned by the Sixth Circuit, nothing prevented Plaintiffs from seeking their supposedly "critical" discovery upon remand. (DN 545). But, Plaintiffs instead allowed another twenty months of litigation to pass before filing an interlocutory appeal of this Court's order denying their second attempt to resolve this matter via an unlawful consent decree. (DN 592). Even more, after the Sixth Circuit affirmed this Court's order denying entry of the second consent decree, Plaintiffs again made no effort to pursue the supposedly "critical" discovery during the three months between remand and the deadline for their summary-judgment response.

Plaintiffs sought delay after delay and stay after stay over Sunrise's objections. Whether this approach was tactical or merely the result of Plaintiffs' failure to treat this case as a priority, Plaintiffs must live with the consequences of their decisions. Plaintiffs finally asserted their claim additional discovery was necessary only on the last day to file a summary-judgment response in the service of avoiding adjudication of the merits of their own claims. Sunrise should not be punished for the strategic choices that led Plaintiffs to this point.

6

### 3. *Plaintiffs' claim that the evidence is "stale" does not support the reopening of discovery.*

Plaintiffs assert generally that discovery should be reopened because the evidence cited in Sunrise's summary-judgment motion was collected before the filing of that motion in 2012. As Plaintiffs' argument goes, because they have requested prospective injunctive relief, they are entitled to evidence of Sunrise's ongoing practices. But, this argument is not supported by the law and is unworkable in practice.

To begin with, the standard for injunctive relief does not require up-to-the-minute evidence of ongoing constitutional violations. A showing of likely recurrent violations would be sufficient to warrant injunctive relief. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (injunctive relief should be granted "if there exists some cognizable danger of recurrent violation"). Plaintiffs have not provided any evidence or assertion that Sunrise's or Kentucky's practices have changed in the last two decades to justify reopening discovery, or the delay and expense associated therewith. It is just as likely that additional discovery would vindicate Sunrise's position. Vague claims that additional discovery might reveal ongoing violations lodged at the last conceivable moment before Plaintiffs' summary-judgment response was due do not provide good cause to reopen discovery. *See Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F.App'x 369, 377 (6th Cir. 2009) (in determining whether good cause exists to modify scheduling order, primary consideration is "moving party's diligence in attempting to meet the case management order's requirements").

In every case where prospective injunctive relief is sought, there inherently will be factual developments between the close of discovery and summary judgment or trial. Requiring continual production of new evidence perpetually would only serve to delay these cases and impose an undue burden on the parties and the Court. Taken to its logical conclusion, Plaintiffs' argument would

result in discovery never being closed and cases never being resolved. In this case, Plaintiffs have demonstrated no qualms about using procedural mechanisms like stays and interlocutory appeals to delay this action as long as possible. If discovery is permitted to be reopened after every one of these procedural contrivances, this two-decade-old case will be litigated into perpetuity. Of course, this is fundamentally at odds with the goals of the justice system. *See* Fed. R. Civ. P. 1 (requiring "just, speedy, and inexpensive determination" of civil proceedings in federal court).

Plaintiffs' supposed need for Sunrise's and Kentucky's updated financial information does not alter this conclusion. Plaintiffs failed to conduct discovery relating to Sunrise's financial and accounting records in the twelve years between the filing of the Complaint and Sunrise's summary-judgment motion. Instead, Plaintiffs focused on irrelevant discovery relating to Sunrise's residents and employees. As noted, the discovery cut-off expired on July 31, 2008. (*See* DN 302). In the twelve years since that date, Plaintiffs never sought to discover this financial information, despite briefly pursuing discovery relating to other matters—namely, former residents and employees of Sunrise. Plaintiffs' decision to seek financial information now, "[w]ithout conceding the relevance or importance of such information," at the last possible moment cannot possibly constitute good cause to reopen discovery. (DN 620, Resp. ¶ 6). Indeed, if Plaintiffs themselves do not even believe that the information is relevant or important, they cannot possibly make the showing required by Rule 56(d). This case is ripe for a decision.

**C.     The Court should grant summary judgment in favor of Sunrise and Kentucky.**

   ***1.     Plaintiffs do not challenge the secular purpose of Kentucky's PCC System.***

When a government is alleged to have violated the Establishment Clause, the Court must consider (1) whether the government has a secular purpose or is "act[ing] with the purpose of advancing or inhibiting religion," and (2) whether the action has the primary "effect of advancing

8

or inhibiting religion." *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997) (internal quotations omitted). Sunrise presented extensive argumentation and evidence in its opening brief demonstrating that Kentucky's PCC System has a secular purpose. (DN 480, MSJ at 19-21).

In their response, Plaintiffs do not challenge at all that the legislative purpose behind the PCC System is to care for dependent, neglected, and abused children who are wards of Kentucky—a secular, rather than religious, purpose. Nor do Plaintiffs argue that the facially secular objectives of the legislation establishing the PCC System are a sham, belying a religious purpose.

Further, Plaintiffs do not argue that the implementation of Kentucky's PCC System is anything other than neutral between religiously-affiliated and non-religious private agencies. In fact, Plaintiffs' response does not cite any state statute, regulation, contract, or conduct at all, much less any action, that could establish that Kentucky is acting with the purpose of advancing religion. Instead, Plaintiffs' response focuses entirely on Sunrise's purportedly pervasively sectarian nature and allegations of proselytization committed by Sunrise. This myopic focus on *Sunrise's* activities cannot and does not establish that *Kentucky* failed to act with a secular purpose. And, as explained below, it also fails to show that Kentucky acted with the purpose of advancing religion.

### 2. *Plaintiffs' response fails to demonstrate that Kentucky's PCC System has the primary effect of advancing religion.*

Plaintiffs' response assumes without evidence that Sunrise is pervasively sectarian (it is not) and then declares that this alleged status precludes Sunrise from receiving any funding whatever from the state without resulting in an Establishment Clause violation. But, this is not at all how the modern remnants of the moribund pervasively sectarian doctrine work. To the extent the doctrine ever operated in this manner, the Supreme Court has greatly diminished its validity.

It speaks volumes that one of the few cases relied upon by Plaintiffs is *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973). In the half-century-old *Nyquist*

case, a program that provided direct monetary grants to certain nonpublic schools for repair and maintenance, reimbursed low-income parents for a portion of the cost of private school tuition, including sectarian school tuition, and granted other parents certain tax benefits was ruled unconstitutional. The Court held that there was no way to ensure that the monies received pursuant to the tuition-reimbursement portion of the program, even though received directly by the parents and only indirectly by the schools, would be restricted to secular purposes. Therefore, according to the Court, the program had "the impermissible effect of advancing the sectarian activities of religious schools." *Id.* at 794.

"The *Nyquist* holding has been undermined by subsequent caselaw that culminated in the [Supreme] Court stating, 'We have departed from the rule that all government aid that directly aids the educational function of religious schools is invalid.'" *Simmons-Harris v. Goff*, 711 N.E.2d 203, 208 (Ohio 1999) (quoting *Agostini v. Felton*, 521 U.S. 203, 225 (1997)). Indeed, subsequent cases have held that even churches themselves and their close affiliates are entitled to participate in programs involving the provision of government funds. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 662-63 (2002) (constitutional for school vouchers to be used for private, religious schools); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024-25 (2017) (state program denying grant for playground resurfacing to religious school, while providing grants to non-religious schools, held unconstitutional); *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 302 (6th Cir. 2009) (constitutional for churches, along with non-religious entities, to receive downtown revitalization grants).

In the controlling concurrence in *Mitchell v. Helms*, 530 U.S. 793, 851, 853 (2000) (O'Connor, J., concurring), the Court further rejected the "irrebuttable presumption" of *Nyquist* that religious organizations would necessarily divert neutral aid for religious purposes. To prove

an Establishment Clause violation, it is no longer adequate to label an institution pervasively sectarian as Plaintiffs have done and claim that government funds *could be* diverted for religious purposes. Rather, "plaintiffs must prove that the aid in question *actually is, or has been*, used for religious purposes." *Id.* at 857 (emphasis added). The Sixth Circuit has stated that the correct formulation of the pervasively sectarian doctrine post-*Mitchell* is not the disavowed irrebuttable presumption a pervasively sectarian organization will divert public aid for religious purposes, but rather an assessment of "whether the record rebuts the presumption they will use the aid to engage in proselytization." *Am. Atheists*, 567 F.3d at 296; (DN 480, MSJ at 28-31 (thorough discussion of pervasively sectarian doctrine post-*Mitchell* and *American Atheists*)).

The test formulated by the Sixth Circuit in *American Atheists* does not focus on the general status or nature of the recipient of government funds—*i.e.*, whether it is pervasively sectarian. Nor does it place a microscopic focus on how the *recipient* spends the government funds. Rather, the appropriate inquiry is how the *government* spends its funds. Indeed, some of the government funding at issue in *American Atheists* went directly to a church for repair of stained-glass windows having obvious religious import. But, in finding the government aid constitutional, the Court focused on the government's purpose behind the aid and the safeguards in place to prevent significant diversion of funds to religious indoctrination, not on the sectarian nature of the recipient. *Am. Atheists*, 567 F.3d at 296.

The *American Atheists* Court found it dispositive of the Establishment Clause claim that the purpose of the aid was secular, the program was neutrally applied to a breadth of beneficiaries, and "the mechanics of the program ensured that the aid would go just to the approved cases." *Id.* Specifically, the Court placed great weight on the fact that the government aid was reimbursed to the churches after they initially financed the projects on their own, stating that whatever

11

Establishment Clause dangers "exist when a city makes open-ended money grants to religious recipients, which may spend the funds on whatever they wish, those dangers do not exist when a city releases funds for approved work on approved projects that the recipient initially finances on its own." *Id.* (internal citation omitted). All of these factors are present here.

Plaintiffs' response does not challenge at all the secular purpose of the aid. Nor does it challenge the neutral implementation of the aid across a breadth of childcare providers, both religiously-affiliated and non-religious. Further, Plaintiffs completely ignore the litany of safeguards put in place by Kentucky to prevent government aid from being used for religious purposes—*i.e.*, the numerous statutes, regulations, and contract terms requiring that the funds can only be used for secular items. (DN 480, MSJ at 2-13) (discussion of Kentucky's statutory and regulatory framework, restrictive contractual terms, and compliance monitoring regime). Plaintiffs ignore that funds provided through the PCC System, like the funds at issue in *American Atheists*, are reimbursements for expenses already incurred. (DN 480, MSJ at 13-15). Most importantly, Plaintiffs ignore that the reimbursements are only issued after Kentucky has conducted a rigorous audit of the expenses incurred, ensuring that every penny is spent only on secular goods or services. (DN 480 at 11-13). These details distinguish Kentucky's PCC System from the direct monetary grants at issue in *Nyguist*, which were unrestricted in how they could be used and were not subject to a monitoring system to ensure there were no improper expenditures. The neutrality of the PCC System, combined with the safeguards employed by Kentucky, distinguishes the PCC System from the program at issue in *Nyquist* and more than satisfies the requirements of the Establishment Clause.

For these same reasons, Plaintiffs' reliance on *Freedom from Religion Foundation v. McCallum*, 179 F. Supp. 2d 950 (W.D. Wis. 2002) is unavailing. In *McCallum*, direct monetary

payments were provided to Faith Works, an addiction treatment program, through government grants and contracts. As in *Nyquist*, the recipient of the funds was not restricted in its usage of the funds and no monitoring system existed to ensure the funds were used for a secular purpose. Thus, the programs at issue in *McCallum* are distinguishable from Kentucky's constitutionally permissible PCC System. In fact, *McCallum* noted that state programs allowing funding to flow to religious entities but that are "targeted or earmarked for discrete, identified secular activities"— like the PCC System—are constitutionally permissible. *McCallum*, 179 F.Supp.2d at 974; *see also Mitchell*, 530 U.S. at 849 (O'Connor, J., concurring) (statute provides that all publicly-funded equipment must be 'secular, neutral, and nonideological' and prohibits 'the making of any payment . . . for religious worship or instruction'); *cf. Agostini*, 521 U.S. at 235 (monthly visits by supervisors sufficient to "prevent or detect inculcation of religion" by publicly-funded teachers); (DN 480, MSJ at 11-13 (discussing Kentucky's compliance monitoring regime)).

Further, Plaintiffs' reliance on *Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 432 F.Supp.2d 862 (S.D. Iowa 2006) is fundamentally at odds with the Sixth Circuit's later controlling opinion in *American Atheists*. In *Americans United*, the District Court conducted a lengthy examination of the religious views of Innerchange, a prison inmate rehabilitation program. *See id.* at 917-24. Not only is the Court's focus on the sectarian nature of the recipient of the funds at odds with Sixth Circuit law, but the Eighth Circuit also rebuked the District Court's reasoning in its opinion reversing in part the District Court's opinion. *See Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 414 n.2 (2007) (holding district court abused its discretion by allowing testimony on pervasively sectarian nature of defendant because such inquiries are "not only unnecessary but

13

also offensive"). The District Court's opinion in *Americans United* is of no legal or persuasive value to the Court.

Likewise, *Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007) is inapposite. *Teen Ranch* involved a religious organization's Free Exercise claim against a government program that declined to provide it funding. The Court affirmed the District Court's holding that the government's non-funding of private religious programs in that case did not constitute a Free Exercise violation. Any discussion of the Establishment Clause in *Teen Ranch* was limited to the district court's reasoning and constituted dicta. Further, whatever persuasive value *Teen Ranch* may have had has been displaced by later, controlling opinions. *See, e.g.*, *Am. Atheists*, 567 F.3d at 296; *Trinity Lutheran,* 137 S. Ct. at 2024-25 (state declining to offer playground resurfacing grant to religious institution violated that institution's Free Exercise rights).

In any event, even assuming for the sake of argument that Sunrise somehow violates Kentucky's numerous statutes, regulations, and contract provisions requiring only secular expenditures—which would be quite an irrational assumption considering Kentucky employs a post-audit reimbursement system—these violations would still prove nothing about whether **Kentucky's** PCC System violates the Establishment Clause. Plaintiffs' Establishment Clause claim is against Kentucky, not Sunrise. To the extent a microscopic review of the PCC System would ever be necessary to show an Establishment Clause violation (it is not here), that review would focus on the details of Kentucky's program, not ground-level activities at Sunrise. *See Am. Atheists,* 567 F.3d at 300 (close cases would require the Court to "sift through the details" of the state's program for violations, not details of funding recipient's actions). But, Plaintiffs' arguments focus only on purported proselytization alleged to have occurred at Sunrise.

Plaintiffs do not allege at all that Kentucky knowingly funds religious expenditures. Nor do they allege that the PCC System is a sham set up for the purpose of improperly subsidizing religion. In fact, Plaintiffs cannot point to a single dollar that was used by Sunrise for a religious use. Sunrise does not spend government funds on religious texts, tuition at religious schools, to maintain a chapel, to train ministers or religious counselors, or for any other non-secular purpose. (DN 480, at 13-15). Indeed, Sunrise's opening brief and evidence established, to a mathematical certainty, that this was not the case. (DN 480, MSJ at 14-16).[3] Because Plaintiffs have failed to identify a genuine issue of material fact, summary judgment in favor of Sunrise is warranted.

## CONCLUSION

For the foregoing reasons, and those stated in Sunrise's and Kentucky's initial motions, the Court should grant summary judgment against Plaintiffs and in favor of Sunrise and Kentucky.

Respectfully submitted,

*/s/ John O. Sheller*
John O. Sheller
Jeffrey A. Calabrese
Steven T. Clark
STOLL KEENON OGDEN PLLC
500 West Jefferson Street, Suite 2000
Louisville, KY  40202
Phone: (502) 333-6000
john.sheller@skofirm.com
jeff.calabrese@skofirm.com
steven.clark@skofirm.com

*Counsel for Defendant,*
*Sunrise Children's Services, Inc.*

---

[3] Plaintiffs' response claims that Sunrise's evidence proving it to be a mathematical certainty that government funds are not diverted to religious purposes is irrelevant. (DN 620, Resp. at 5-6). Not so. Plaintiffs' argument derives from *Nyquist* and other cases relying on the outdated *Nyquist* opinion. The current approach adopted by the Sixth Circuit in *American Atheists* allows the Court to review the record—with no restrictions on its consideration of mathematical and accounting evidence—in determining whether Sunrise has rebutted Plaintiffs' Establishment Clause claim based on unsupported allegations that Kentucky is improperly subsidizing religion.

## CERTIFICATE OF SERVICE

      I hereby certify that on the 18th day of December 2020, I electronically filed the foregoing with the Clerk of Court using CM/ECF system, which will send email notification to all parties of record.

      */s/ John O. Sheller*
      *Counsel for Defendant,*
      *Sunrise Children's Services, Inc.*